IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAURIE J. SAMUEL<br>1151 4th Street, SW, #519<br>Washington, DC 20024,<br><br>**Plaintiff,**<br><br>v.<br><br>METROPOLITAN POLICE DEPARTMENT<br>300 Indiana Avenue, NW<br>Washington, DC 20001,<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>) **Civil Action No.**<br>)<br>)<br>)<br>)<br>)<br>)<br>) **JURY TRIAL DEMANDED** |

**COMPLAINT**
**(National Origin Discrimination; Retaliation)**

Pursuant to Federal Rule of Civil Procedure Rule 3, Plaintiff Laurie J. Samuel (hereafter "Plaintiff"), by her undersigned attorney, hereby files her Complaint.

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction of the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e-5(f).

2. In or about May 4, 2014, Plaintiff filed a formal Charge of Discrimination in EEOC No. 570-2014-00840 with the EEOC and the DC Office of Human Rights.

3. The EEOC accepted Plaintiff's formal Charge of Discrimination as timely.

4. Defendant was duly notified about Plaintiff's administrative complaints and was given an opportunity to respond to her allegations.

5. On March 9, 2015, the EEOC made a decision on the merits of Plaintiff's

discrimination claims and on March 23, 2015, issued her a Notice of Right to Sue, by regular mail.

6. This Complaint is filed within 90 days after Plaintiff received the Notice of Right to Sue on her EEOC complaint.

7. Plaintiff has exhausted the administrative remedies available to her under 42 U.S.C. §§ 2000e, *et seq.*, and all conditions precedent have occurred or been performed.

8. Venue in this District and in this Division is appropriate pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c), as Defendant Metropolitan Police Department (hereinafter "Defendant") has extensive and deliberate contacts in this District and Division, including a business location at 300 Indiana Avenue, NW, Washington, DC 20001, at which Plaintiff performed work during her tenure with Defendant.

## II. THE PARTIES

9. Plaintiff is a resident of the District of Columbia and a former employee of Defendant.

10. Defendant is a political subdivision of the District of Columbia created pursuant to DC law, which employees more than 500 employees.

## III. FACTS CENTRAL TO PLAINTIFF'S CLAIMS

11. Plaintiff is a Canadian national.

12. In or around August 1998, Plaintiff moved to the United States to attend graduate school. She completed a Master's of Science in Criminal Justice and eventually received her Ph.D in Criminology.

13. On January 9, 2006, Plaintiff began her employment with Defendant as a Project Specialist in the Human Resources Management Division (HRMD).

14. Plaintiff served in the Project Specialist role for over six years overseeing MPD's

Early Identification and Intervention System (EIS) as well as a number of other programs and special projects.

15. Upon joining Defendant, Diane Haines Walton, Director of HRMD, was Plaintiff's direct supervisor.

16. Since the beginning of her employment, Ms. Haines , maintained an ongoing pattern of harassing Plaintiff because of her national origin.

17. In or about June 2008, Plaintiff began taking on more responsibility as directed by the Chief of Police.

18. Ms. Haines harbored resentment which manifested in snide remarks about Plaintiff's heritage and her work.

19. For example, on one occasion in or around May 2009, Ms. Haines told Plaintiff that she "talked white" which was not typical of an "African American."

20. When reviewing cases, often times Ms. Haines would begin sentences with "here in America we …"

21. Once it became apparent to Plaintiff that Ms. Haines was targeting her because of her national origin, she began documenting each occurrence and informing her colleagues in senior management who worked in the Chief's Office.

22. During 2009-2010, while Plaintiff was going through the Defendant sponsored permanent residency process, Ms. Haines would share with subordinate employees, Lennie Moore, Dwayne Booker, and Rita Young that she did not support the Police Chief's decisions to support Plaintiff. Ms. Haines questioned what was so special about her.

23. In or around spring 2010, during a discussion over discipline of an HR employee, Ms.

3

Haines objected to Plaintiff's claim that the employee lied about a death in the family. She proceeded to explain to Plaintiff in a hostile manner the concept of "play cousins" in the United States and how it does not exist in Canada.

24. In or about June 2010, Plaintiff wanted to apply for the vacant Deputy Director position in HRMD. Plaintiff was more than qualified for the position and even served as Acting Director of Human Resource Management Division when Ms. Haines was on extended sick leave.

25. When Plaintiff discussed position with Ms. Haines, she was very negative and stated that she was going to hire someone outside of the organization.

26. As a result of her conversation with Ms. Haines, Plaintiff felt that it would be futile for her to apply for the position.

27. The environment in HRMD became so unbearable that in or around September 2010, Plaintiff made her first of numerous requests to Mr. Durham that he authorize a transfer to another part of the police department so that she would not have to interact with Ms. Haines and not subject to a hostile work environment.

28. Plaintiff's request, as well as the others she would make afterwards, were denied.

29. Upon information and belief, in or October 2010, someone from the Office of the Chief of Police informed Ms. Haines about Plaintiff's complaints to Mr. Durham about how she created a hostile work environment for Plaintiff.

30. Plaintiff found out from Mr. Moore that Ms. Haines was angry with her. As a result, Ms. Haines would begin to retaliate against Plaintiff and continue her discriminatory behavior towards her.

31. In or about November 2010, while Defendant was in the process of obtaining

permanent residency status for Plaintiff, Ms. Haines told Mr. Moore, the HR Specialist overseeing the process, that she wanted to "hire an American" for Plaintiff's position.

32. In or around December 2010, Plaintiff approached Executive Assistant Chief Alfred Durham and Commander Ralph Ennis about Ms. Haines' discriminatory treatment of her.

33. In particular, Plaintiff was most concerned about Ms. Haines open hostility regarding her application for permanent residency sponsored by Defendant as well as Ms. Haines' comments about wanting to hire an American for her position.

34. In her conversation with Mr. Durham and Mr. Ennis, Plaintiff shared how Ms. Haines' discriminatory treatment of her created a hostile work environment to the point that it was causing her stress. Plaintiff made it clear to Mr. Durham and Mr. Ennis that she believed Ms. Haines was subjecting her to national origin discrimination.

35. Plaintiff also shared with Mr. Durham and Mr. Ennis that Ms. Haines was not only unsupportive of Defendant's backing of her permanent residency application, but was actively disrupting the process by not completing paperwork in a timely manner. Ms. Haines' actions were especially worrisome because Plaintiff's status in the United States could be negatively impacted.

36. Mr. Durham told Plaintiff he would look into her concerns. However, Ms. Haines continued her discriminatory treatment of Plaintiff.

37. Furthermore, at around this time, Plaintiff began seeking the care of her medical care professionals to deal with the stress and stress related physical ailments that were caused by Ms. Haines' negative actions.

38. In or around April 2013, Ms. Haines released a copy of Plaintiff's personnel records

without her permission to a third party during a deposition. This prompted an investigation by the Internal Affairs Division (IAD).

39. Moreover, in or around April 2013, when Michael Anzallo, Assistant Chief, encouraged Plaintiff to apply for the EEO Director position within the Internal Affairs Bureau, Ms. Haines blocked Plaintiff's initial application claiming she was not qualified.

40. Mr. Anzallo had to request an audit of Plaintiff's skills, experience, and education in order for her to be able to apply for the position.

41. During the audit process for the EEO Director position, Ms. Haines told the assigned HR Specialist, Rita Young, that she did not want Plaintiff to be selected for the position. Further, Ms. Haines stated to Ms. Young that she was not going to sign or approve any paperwork otherwise.

42. Ms. Young's audit clearly indicated that Plaintiff was qualified for the EEO Director position.

43. In or around May 2013, Plaintiff went on to apply for the EEO Director position, received an interview, was selected for the position, and placed on the certification list.

44. As part of the hiring process, the certification list was transmitted from the Internal Affairs Bureau to HRMD for review.

45. Ms. Haines allegedly replaced Plaintiff's name on the certification with her friend's name.

46. Mr. Anzallo alerted the Chief's Office and Ms. Haines was ordered to change the name on the certification list back to Plaintiff's.

47. Soon thereafter, Ms. Haines went to the Chief of Police and informed her that Plaintiff was illegally in the United States.

48. Ms. Haines produced a copy of an expired work visa that she had in her possession of which Plaintiff had no knowledge.

49. In or around August 2010, Defendant hired a private law firm to complete Plaintiff's permanent residency process.

50. In or around December 23, 2010, the private law firm filed an I-140 petition.

51. In or around March 3, 2011, Defendant and Plaintiff learned that Homeland Security denied Plaintiff's petition.

52. However, on April 28, 2011, under § 106(a) of the American Competitiveness Act of the 21st Century, the private law firm filed another petition to have Plaintiff's H1-B Visa extended for one year in addition to retroactively giving her extra time from when Plaintiff had been outside of the United States over the past six years.

53. Plaintiff would often check-in with the private law firm to check on the status of the H1-B petition. However, she never received word from the attorney working on her case as to whether there were any updates.

54. Moreover, staff members from the Executive Office of the Chief of Police, Matthew Bromeland, Esq. and Inspector Ralph Ennis contacted the Department of Homeland Security every few months to check the status of the H1-B petition. Each time, Homeland Security told the staff members that Plaintiff's petition was pending.

55. Based off the pending status of the Plaintiff's petition, Defendant's attorneys advised Plaintiff that she was allowed to remain in the United States and continue working.

56. Defendant is responsible for completing the paperwork for employment-related Visas.

Once approval is received from Homeland Security, then the organization must by law give Plaintiff notice so that so that proper visa paperwork and travel documents may be secured for her passport.

57. Despite the actions of Ms. Haines, during the course of her employment with Defendant, Plaintiff's work performance was exemplary. Plaintiff was a model employee and never received any disciplinary actions.

58. For instance, on March 1, 2012, Plaintiff received the Deborah E. Ennis Civilian Employee of the Year for her work on the Supervisory Support Program.

59. In or around September 2012, Plaintiff was transferred to the Internal Affairs Bureau and became the Acting Manager, EEO & Diversity. Ms. Haines no longer was Plaintiff's supervisor.

60. When Plaintiff was transferred to the Internal Affairs Bureau, her office moved from the 6th floor to the 5th floor of Defendant's headquarters. The Executive Director of Corporate Support, Ms. Haines' direct supervisor, authorized the move of all of Plaintiff's furniture and files.

61. On the morning of the move, Ms. Haines had the Captain from HRMD block the door to Plaintiff's old office so the furniture could not be moved. She erroneously claimed that Plaintiff was trying to take the furniture.

62. Mr. Anzallo had to intervene on Plaintiff's behalf. After about an hour, the furniture movers were finally able to move the furniture after Ms. Haines' supervisor reiterated that she approved the move.

63. On August 30, 2013, Defendant placed Plaintiff on administrative leave.

64. At this point, after approximately two years, Plaintiff still did not have any information

about the status of her petition other than it was still pending. Plaintiff routinely checked in on the status of her petition as well as another employee of Defendant.

65. On September 11, 2013, Defendant threatened her with termination for not having the proper work permit. Incidentally, Plaintiff received notification from Ms. Haines.

66. On September 12, 2013, Plaintiff, to her dismay, learned that the H1-B petition had in fact been approved and that a copy of the approval notice was sent to Ms. Haines in or around July 15, 2011.

67. Plaintiff had never seen the approval notice and Ms. Haines did not inform her of its arrival.

68. The H1-B extension expired on April 30, 2012. If Ms. Haines had properly and timely informed Plaintiff that it was in her possession, Plaintiff would have made arrangements to apply for another type of work permit before the expiration date.

69. Plaintiff has lived in the United States for 15 years and is aware of the seriousness of maintaining her residency and responding to work permit deadlines.

70. Plaintiff believes that Ms. Haines' withholding of her petition approval to remain in the United States to continue working with MPD was retaliation for her prior complaints of Ms. Haines' discriminatory treatment of her.

71. Although Plaintiff made multiple complaints to senior managers, upon information and belief, Defendant did not take any corrective action against Ms. Haines. In fact, Ms. Haines treatment of Plaintiff became more worse and hostile.

72. On October 4, 2013, Plaintiff was constructively discharged from her employment with Defendant due to Ms. Haines' discriminatory treatment.

73. Any reason Defendant gives for the different terms and conditions of employment and

discharge is pretext to discrimination against her due to her national origin.

74. Plaintiff has been unemployed since her termination and her resident status in the United States in limbo.

75. As a result of the Defendant's actions, Plaintiff has suffered loss of income, emotional distress, and pecuniary damages.

## IV. STATEMENT OF CLAIMS

### Count I: National Origin Discrimination (Title VII)

76. Plaintiff adopts and incorporates by reference ¶¶ 1-75 above.

77. As stated above, Plaintiff is a Canadian national.

78. Defendant unlawfully discriminated against Plaintiff on the basis of her national origin in violation of Title VII.

79. Specifically, Defendant discriminated against Plaintiff by making offensive remarks about her nationality and making it difficult for her to advance within the police department.

80. Further, Defendant sabotaged Plaintiff's ability to extend her work permit so that she can remain within the United States and continue working for Defendant.

81. As a result of Defendant's violations of Title VII, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

### Count II: Retaliation (National Origin)

82. Plaintiff adopts and incorporates by reference ¶¶ 1-81 above.

83. As stated above, Plaintiff is a Canadian national.

84. Defendant retaliated against Plaintiff when she complained of discriminatory treatment

by Ms. Haines from a period beginning in 2009 up until her constructive termination in October 2013.

85. Further, Ms. Haines retaliated against Plaintiff for complaint to senior management officials about discrimination by withholding important information in Plaintiff's efforts to extend her work permit, which lead to her unfair departure from Defendant.

86. As a result of Defendant's violations of the Title VII retaliation clause, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

## IV. **REMEDIES SOUGHT**

87. WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting her the following relief from Defendant:

   a. A declaratory judgment that defendant discriminated against Plaintiff, as alleged herein;

   b. Back pay, including without limitation other lost benefits due to Defendant's discrimination against Plaintiff;

   c. Compensatory and punitive damages, pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a(a)(2), 1981a(b)(3)(A), for taking these actions with malice and bad faith;

   d. Prejudgment and post judgment interest on all damages, on the lost compensation and compensatory damages;

   e. Reasonable attorneys' fees and costs under 42 U.S.C. §§ 1981a, 2000e-5(k); and

   f. Such other and further relief as to the Court seems just and warranted.

## VI. JURY TRIAL DEMAND

88. Plaintiff requests a jury trial on all issues of fact and damages arising herein.

        Respectfully submitted,

        *Edgar Ndjatou*
        _____
        EDGAR NDJATOU
        McCree Ndjatou, PLLC
        1350 Connecticut Avenue, NW, Suite 850
        Washington, DC 20036
        T:  (202) 618-7092
        F:  (202) 370-7173
        endjatou@mnlawyerspllc.com
        <u>Attorney for Plaintiff</u>