# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| LAURIE SAMUEL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-1167 (RC) |
| | : | | |
| v. | : | Re Document No.: | 14 |
| | : | | |
| METROPOLITAN POLICE DEPARTMENT, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This is a case where there simply is no "there" there. Ms. Laurie Samuel was forced to resign from the District of Columbia Metropolitan Police Department because her visa expired and she could not obtain permanent residency status. Ms. Samuel claims that her employer, through human resources director Ms. Diane Haines-Walton, withheld information from her that would have given her the opportunity to apply for a visa extension, which would allow her to continue working in the United States. Neither side disputes that Ms. Samuel was threatened with termination and that it would have been illegal for the D.C. Metropolitan Police Department to continue to employ her. Understandably frustrated, Ms. Samuel contends that her resignation was the inevitable consequence of Ms. Haines-Walton's sabotage of her visa application, a sabotage Ms. Samuel asserts was carried out because she is from Canada and because she complained about Ms. Haines-Walton's discriminatory treatment.

Even assuming such an act of sabotage occurred (an assumption based on scant evidence), the simple problem with Ms. Samuel's theory is that there is no permissible evidence

in the record suggesting that the sabotage had any effect on Ms. Samuel's eventual resignation. Her immigration status would necessarily have expired a year before she was terminated because she was not eligible for further extensions, and she has not shown any other way that she could have continued working legally. Thus, the alleged sabotage of Ms. Samuel's visa is analytically unconnected to her resignation for Title VII purposes.

As for the adverse employment action that she experienced, Ms. Samuel has not shown that the basis for her termination—her unlawful immigration status—was a mere pretext for discrimination or retaliation. She openly admits that she had strong relationships with the individuals who made the decision to force her to resign. And even if the only person allegedly biased against her, Ms. Haines-Walton, did have power to fire her, Ms. Samuel has not shown that she actually had any animus against her because of her Canadian national origin or because she complained about discriminatory treatment. Indeed, during her deposition, Ms. Samuel did not even mention national-origin discrimination despite being asked about it. Putting aside inadmissible information that the Court cannot consider at the motion-for-summary-judgment stage, the only evidence that Ms. Samuel can point to in support of her claim of pretext is a statement in her last-minute declaration repeating the allegation in her complaint that Ms. Haines-Walton prefaced sentences with something to the effect of "here in America, we do things this way." This preface, though arguably offensive, is insufficient to establish pretext. Taking everything together, the Court enters summary judgment in favor of Defendant insofar as Plaintiff seeks recovery for disparate treatment. However, because Plaintiff also appears to seek relief on hostile-work-environment grounds and Defendant did not satisfactorily address that claim on summary judgment, Plaintiff's case survives (at least for now).

## II. FACTUAL BACKGROUND[1]

Plaintiff Laurie Samuel, a Canadian citizen, sued the D.C. Metropolitan Police Department ("MPD") for discriminating and retaliating against her based on her national origin. *See* Compl. at 10–11, ECF No. 1; *see also* Decl. of Laurie Samuel ("Samuel Decl.") ¶ 2, ECF No. 32-2. She claims that she experienced disparate treatment and a hostile work environment because she is Canadian. *See* Compl. ¶ 34 ("Ms. [Haines-Walton's] discriminatory treatment of her created a hostile work environment . . . ."); Compl. ¶ 36 ("Ms. [Haines-Walton] continued her discriminatory treatment . . . ."); Compl. ¶ 72 ("Plaintiff was constructively discharged . . . due to Ms. [Haines-Walton's] discriminatory treatment."). Starting in 2006, Ms. Samuel began working for MPD as a project specialist in the MPD Human Resources Management Division. Samuel Decl. ¶ 14. Ms. Samuel interviewed with, and ultimately was hired by, the director of the Human Resources Management Division, Ms. Diana Haines-Walton. Samuel Decl. ¶¶ 19–20. According to Ms. Samuel, Ms. Haines-Walton was aware of Ms. Samuel's Canadian national origin during the interview, and immediately began harassing her about it after she started working at MPD. Samuel Decl. ¶¶ 20, 22. Ms. Samuel alleges that no MPD employee other than Ms. Haines-Walton discriminated or retaliated against her. Dep. of Laurie Samuel ("Samuel Dep.") at 30, ECF No. 32-3. In January 2013, Ms. Samuel transferred from H.R. to Internal Affairs, meaning she stopped working for Ms. Haines-Walton. Samuel Decl. ¶ 88.

According to Ms. Samuel, Ms. Haines-Walton discriminated against her by "maintain[ing] an ongoing pattern of harassing" behavior toward her, in part by making "snide

---

[1] In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, when the facts are in dispute, the Court views the evidence in the light most favorable to Ms. Samuel.

comments" about her national origin. Samuel Decl. ¶¶ 22, 24–26. After Ms. Samuel had worked at MPD for around two years, the Chief of Police began giving her more responsibility, which made Ms. Haines-Walton even more upset with Ms. Samuel. Samuel Decl. ¶¶ 23–24; Samuel Dep. at 31. Ms. Samuel maintains that Ms. Haines-Walton tried to stand in the way of her career progression, *see* Samuel Decl. ¶¶ 101–02, but does not contend that Ms. Haines-Walton ever successfully prevented her from receiving a promotion, *see* Samuel Dep. 23–27. *See also* Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 14, ECF No. 32 ("While Plaintiff was successful in obtaining promotions to Acting Manager, EEO & Diversity and the EEO Director, she accomplished these feats despite Ms. Haines-Walton's continued attempts to sabotage her success."). Ms. Samuel also claims that Ms. Haines-Walton sabotaged her applications for a visa extension and permanent residency, which ultimately led to her termination because MPD could not employ her without a visa. Samuel Decl. ¶¶ 37–38.

As for retaliation, Ms. Samuel contends that, after she approached supervisors at MPD about the discrimination outlined above, Ms. Haines-Walton started withholding important immigration information from her. Compl. ¶ 85. She claims that this inevitably led to her resignation, which was actually a constructive termination. Compl. ¶ 84; Samuel Decl. ¶¶ 68–69.

## A. Ms. Samuel's Pursuit of Permanent Residency

Because she was not a United States citizen, Ms. Samuel needed a visa to begin working at MPD. So, she transferred her H-1B visa—a non-citizen visa that allows foreign nationals in "specialty occupations" to work in the United States, *see RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 42 (D.D.C. 2009)—from her previous job to MPD. Samuel Decl. ¶ 15. She received her H-1B visa with MPD in January 2006. Samuel Dep. at 49–50;

Samuel Decl. ¶ 15. But because H-1B visas are only valid for three years and may be extended only up to an additional three years, Ms. Samuel needed to upgrade her immigration status to continue working for MPD after September 2012. *See* 8 C.F.R. § 214.2(h)(15)(ii)(B)(1) ("An extension of stay may be authorized for a period of up to three years for a beneficiary of an H-1B petition . . . . [But] [t]he alien's total period of stay may not exceed six years."); Samuel Dep. Ex. C Attach. 6, ECF No. 27-1. Thus in mid-2009, Ms. Samuel asked MPD, as her employer, to sponsor her application for permanent residency status. Samuel Decl. ¶ 29.

Ms. Samuel began the process of seeking sponsorship by approaching employees in the MPD's Office of the Chief. Samuel Decl. ¶ 29. Eventually those employees told Ms. Samuel that she should go through her supervisor, Ms. Haines-Walton. *See* Samuel Decl. ¶ 32. When Ms. Samuel approached her about the situation, Ms. Haines-Walton was annoyed by the fact that she had gone over her head to the Chief, but nonetheless agreed to look into the matter. Samuel Decl. ¶ 32. MPD ultimately agreed to sponsor Ms. Samuel. Dep. of Diana Haines-Walton ("Haines-Walton Dep.") at 32–33, ECF No. 32-4. Ms. Haines-Walton was solely responsible for managing Ms. Samuel's visa application. Samuel Decl. ¶ 33.

Within about a week of Ms. Samuel approaching Ms. Haines-Walton, Ms. Haines-Walton drafted a memorandum requesting $10,000 to support Ms. Samuel's application. *See* Haines-Walton Dep. at 33. Having received the funding, in around August 2009, Ms. Haines-Walton contracted with the Immigration Law Group to pursue the permanent resident status. Samuel Decl. ¶ 36. In July 2010, Ms. Haines-Walton terminated the Immigration Law Group because it did not timely file immigration paperwork, causing the Department of Labor to deny Ms. Samuel's permanent-residency application. Samuel Decl. ¶¶ 50–53. Ms. Haines-Walton then contracted with the law firm Duane Morris to pursue another application for permanent

residency. Samuel Decl. ¶¶ 33, 54–55. In addition to submitting another application, Duane Morris filed a petition to have Ms. Samuel's H-1B visa extended for one year plus any time that she had spent outside the United States. Samuel Decl. ¶ 66. Sometime between Ms. Haines-Walton contracting with Duane Morris and the spring of 2011, Ms. Haines-Walton stopped working with Ms. Samuel. Samuel Dep. at 83 (stating that Ms. Haines-Walton "washed her hands of anything" to do with Ms. Samuel).

Ms. Samuel frequently checked on the status of her applications with Duane Morris, but was never given information about any updates or decisions related to her case. Samuel Decl. ¶ 80. Other MPD staff members checked on the status of her H-1B extension application with the Department of Homeland Security ("DHS"), but each time they checked, it showed as "pending" with DHS. However, according to Ms. Samuel, Ms. Haines-Walton "did not express much concern for the status of [her] extension." Samuel Decl. ¶ 84. Ms. Samuel told Ms. Haines-Walton that she was concerned with the status of her application in light of her conversations with Duane Morris and DHS, but Ms. Haines-Walton "did nothing to address the issue." Samuel Decl. ¶¶ 84–87.

In July 2011, DHS granted Ms. Samuel's extension to April 2012. Samuel Decl. ¶¶ 110–112; *see also* Pl.'s Opp'n Ex. 5, ECF No. 32-6. In DHS's approval notice, it informed Ms. Samuel that to apply for another extension, MPD would have to submit an application by April 2012. Samuel Decl. ¶ 111. According to Ms. Samuel, Ms. Haines-Walton and Duane Morris received notice, but Ms. Haines-Walton never informed Ms. Samuel of the approval. Samuel Decl. ¶¶ 112–13. In support of her statement, Ms. Samuel points to a copy of the notice, which is addressed to MPD, "c/o Diana Haines." Pl.'s Opp'n Ex. 4, ECF No. 32-5. Ms. Haines-Walton claims that she did not personally receive this notice. Haines-Walton Dep. at 59.

Ms. Haines-Walton also did not maintain any kind of public folder containing Ms. Samuel's immigration papers, which Ms. Samuel contends she was required to do under Department of Labor rules. Samuel Decl. ¶¶ 116–17. But MPD claims that Chief Rodney Parks was the official responsible for placing the visa documents in a public file. Haines-Walton Dep. at 59–60. Eventually, Ms. Samuel's visa expired. Samuel Decl. ¶ 108–09; Samuel Dep. at 41. Another employee emailed the DHS's notice and deadline for reapplication to Ms. Samuel in September 2013, over two years after approval and well past the deadline to apply for another extension. Samuel Decl. ¶¶ 110, 114; Pl.'s Opp'n Ex. 4. Ms. Samuel states that she would have applied for another extension had she known about the deadline. Samuel Decl. ¶ 114. But, as noted above, given that H-1B visas are only valid for three years and may be extended for only an additional three years, the latest that Ms. Samuel could have worked using her H-1B visa was September 2012.[2] *See* Samuel Dep. Ex. C Attach. 6. Nonetheless, she asserts that she would have made other arrangements had she been aware of the deadline. Samuel. Decl. ¶ 114.

In 2011, Ms. Samuel's request for permanent residency was denied. *See* Samuel Dep. Ex. C. Duane Morris unsuccessfully appealed that decision. *See* Samuel Dep. Ex. C. In August 2013—nearly a year beyond the date for which Ms. Samuel could have obtained an extension—when MPD realized that Ms. Samuel's visa had expired and she did not have a legal basis to

---

[2] Ms. Samuel originally received her H-1B visa in January 2006. Samuel Dep. at 49–50. However, because the regulations governing H-1B visas apparently allow an applicant to "recapture" time spent outside of the United States during the duration of the H-1B visa, Ms. Samuel was eligible for additional time. Samuel Dep. Ex. C. at 3; *see* 8 C.F.R. § 214.2(h)(2)(i)(D), (h)(13)(iii)(A), (h)(13)(iii)(C)(1). The record is somewhat unclear as to whether the additional time made her H-1B eligible until April 2012 or September 2012. *Compare* Samuel Dep. at 50–51, *and* Samuel Dep. Ex. C at 3 (in a summary of Ms. Samuel's administrative statement, stating that Duane Morris's extension application included the cumulative time she spent outside the country), *and* Ex. C Attach. 4 at 3 (letter from Ms. Samuel stating that Duane Morris's extension included the time she was out of the country), *with* Samuel Decl. ¶ 17. Although it does not affect the Court's analysis, the Court assumes the later date.

remain in the United States, the Assistant Chief of Police asked Ms. Samuel to demonstrate that she had a valid work visa. Samuel Decl. ¶ 105; Samuel Dep. at 40–41. On August 30, 2013, Ms. Samuel was placed on administrative leave. Samuel Decl. ¶ 107. In October, an MPD Assistant Chief, at the behest of the Chief of Police, called Ms. Samuel to tell her she was going to be terminated. Samuel Dep. at 43. The employee asked Ms. Samuel to resign and suggested that if she did not, she would never work in law enforcement again and would otherwise experience professional repercussions in the future. Samuel Dep. at 43–45. These repercussions would have been devastating to her career, because it was heavily devoted to criminal justice. *See* Samuel Decl. ¶ 122. As a result, she resigned her position at MPD on October 4, 2013. Samuel Dep. at 45.

Up until she was asked to resign, at that point working in a different department from Ms. Haines-Walton, Ms. Samuel had a good working relationship with her supervisor and colleagues. Samuel Dep. at 24, 83. Indeed, Ms. Samuel was "friendly" with the Chief of Police; they "would go to dinner together" and "talk outside of work." Samuel Dep. at 22. Ms. Samuel even went to the Chief's home over holidays, including for Thanksgiving and Christmas meals with just the Chief and her immediate family. Samuel Dep. at 22. When asked, Ms. Samuel said she "[a]bsolutely" thought the Chief of Police wanted her career to grow at MPD. Samuel Dep. at 23. Ms. Samuel was also friends with her immediate supervisor, with whom she "had a really good working relationship." Samuel Dep. at 24. She was also friendly with the supervisor that ultimately asked her to resign. Samuel Dep. at 44.

## B. Ms. Haines-Walton's Alleged Animus

The cause of the friction between Ms. Haines-Walton and Ms. Samuel is somewhat unclear. During Ms. Samuel's deposition, in the context of discussing national origin discrimination, the following exchange occurred:

> Q: Why do you think you were discriminated against because of your national origin?
>
> A: I mean, I -- I would be speculating.
>
> [Plaintiff's counsel]: You have to state it.
>
> A: Okay. . . . I think she did not like me. I think that she was threatened [by] my relationship with the Chief of Police. I think she was—and again, this is just based on comments that she made[—]I think she was jealous about the way I looked because she would always make snide comments about the fact [that] I'm very into health. . . . I ultimately think she felt threatened about her job and being usurped eve[n] though I never wanted her job.

Samuel Dep. at 30–31. Ms. Samuel did not mention her national origin nor any comments made by Ms. Haines-Walton about her Canadian heritage. *See* Samuel Dep. at 30–31. In the context of discussing Ms. Haines-Walton's failure to follow up with Ms. Samuel about her visa application from 2011 until her termination, the following exchange occurred:

> Q: Did Ms. [Haines-]Walton . . . check in [with Homeland Security] on your behalf . . . ?
>
> A: No.
>
> Q: Is there any reason why that is? . . .
>
> A: I just think that particularly once I left HR or started working more so with Internal Affairs that she kind of just washed her hands of anything with me.

Samuel Dep. at 82–83. Ms. Samuel once again did not mention her Canadian national origin. *See* Samuel Dep. at 82–83.

Ms. Samuel's declaration paints a different picture. According to that document, which was sworn on the date her opposition was filed and about four months after her deposition,

*compare* Samuel Dep. *with* Samuel Decl., Ms. Haines-Walton manifested discrimination toward her Canadian national origin in multiple ways. She states that from the beginning of her employment with MPD, Ms. Haines-Walton "maintained an ongoing pattern of harass[ment] because of [Ms. Samuel's Canadian] origin." Samuel Decl. ¶ 22. This pattern included "snide remarks" about her heritage and prefacing sentences with "here in America, we…" when she reviewed cases with Ms. Samuel. Samuel Decl. ¶¶ 24, 26. Ms. Samuel heard from a colleague that Ms. Haines-Walton did not like her "because of [her] national origin and because of [her] success," and that she did not understand why the Chief wanted MPD to sponsor her application for permanent residency. Samuel Decl. ¶ 38–39. Ms. Samuel's colleague also told her that Ms. Haines-Walton said she intended to hire an American instead of Ms. Samuel.[3] Samuel Decl. ¶ 38.

Ms. Samuel also stated that Ms. Haines-Walton attempted to sabotage her career advancement at MPD. Samuel Decl. ¶¶ 44–47, 57–60. According to Ms. Samuel, in 2010 she wanted to apply for the vacant position of Deputy Director in the human resources office. Samuel Decl. ¶ 57. Despite being "more than qualified," Ms. Samuel alleges, Ms. Haines-Walton "was very negative and discouraged [her] from applying" and stated that she planned to hire someone from outside the organization. Samuel Decl. ¶ 58–59. As a result, Ms. Samuel believed the selection process was sabotaged by Ms. Haines-Walton against her. Samuel Decl. ¶ 60. When Ms. Samuel received a promotion and was moving floors at MPD, Ms. Haines-Walton allegedly tried to block Ms. Samuel from moving the furniture upstairs, claiming that it

---

[3] The full statement in the affidavit is as follows: "In or around January 2010, in conversations with Mr. Moore, who was in charge of the interview process, he confided in me that Ms. Haines told him that she does not understand why Chief Lanier is even endorsing my application for permanent residency and that she intends on hiring an American instead of me." Samuel Decl. ¶ 38.

could not be taken from that floor.  Samuel Decl. ¶ 89–90.  Ms. Samuel claims this was another example of creating a hostile work environment.  Samuel Decl. ¶ 91.  Ms. Samuel did not specifically tie these examples to her Canadian national origin in more than conclusory terms. *See generally* Samuel Decl.

Later in 2010, Ms. Samuel reported Ms. Haines-Walton to the Office of the Chief for discriminating against her.  *See* Samuel Decl. ¶ 62–63.  Ms. Haines-Walton found out about that complaint in 2011, and then, allegedly in retaliation for that complaint, she continued making a hostile work environment for Ms. Samuel.  Samuel Decl. ¶¶ 68–69.  For example, Ms. Samuel stated that she "learned that Ms. Haines-Walton allegedly replaced [her] name" from a certification list after she received a promotion.  Samuel Decl. ¶¶ 101–103.  She does not claim to have personal knowledge of this information, but says she was told about it by another employee.  Samuel Decl. ¶ 102.  Despite Ms. Haines-Walton's attempted sabotages of Ms. Samuel, however, she was selected for the two positions she applied for—Acting Manager of Equal Employment Opportunity ("EEO") and Diversity and EEO Director.  *See* Pl.'s Opp'n at 14; Samuel Decl. ¶¶ 88–104.

### III.  LEGAL STANDARD

The Court must grant summary judgment to a movant who "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of fact is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court "view[s] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in [her] favor." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

A party opposing summary judgment cannot rest on her pleadings. *See* Fed. R. Civ. P. 56(e). After the moving party comes forward with proof of the absence of a genuine issue of material fact, the nonmoving party bears the burden of showing that there is such a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party must cite to materials other than the pleadings themselves, show that the moving party's materials are insufficient, or show that its claims could not be supported by admissible evidence at trial. *See id.* at 324; Fed. R. Civ. P. 56(c). If the opposing party's supporting materials are "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50 (internal citations omitted). A party may not rely on "statements that are impermissible hearsay or that are not based on personal knowledge" in opposing a motion for summary judgment. *Shuler v. District of Columbia*, 744 F. Supp. 2d 320, 327 (D.D.C. 2010); *see also Stebbins v. Gov't Emps. Ins.*, No. 78-cv-415, 1979 WL 144, at *2 (D.D.C. Feb. 23, 1979) ("It is well established that hearsay affidavits in opposition to a summary judgment motion should be disregarded."). A party also may not rely on conclusory allegations or unsubstantiated speculation. *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) (citing *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 200 n.12 (D.D.C. 2008)), *aff'd*, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015).

Under Title VII of the Civil Rights Act of 1964, "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e-16(a). Direct evidence of discrimination or retaliation generally entitles the plaintiff to a jury trial. *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011); *see also Telesford v. Md. Provo-I Med. Servs., P.C.*, 204 F. Supp. 3d 120, 128 (D.D.C. 2016). In the absence of direct evidence of discrimination or retaliation, such claims are usually analyzed under the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Clipper v. Billington*, 414 F. Supp. 2d 16, 21, 25 (D.D.C. 2006); *see also George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005).

The first step of the *McDonnell Douglas* framework requires the plaintiff to make out a prima facie case of disparate treatment. In the case of discrimination, this requires Ms. Samuel to show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) "the unfavorable action gives rise to an inference of discrimination." *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 181 (D.D.C. 2016), *reconsideration denied*, 185 F. Supp. 3d 135 (D.D.C. 2016); *see also Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004) (noting that the D.C. Circuit has "articulated an alternative formulation" of the *McDonnell Douglas* test for claims "that extend beyond . . . typical 'failure-to-hire' situations"). For retaliation claims, Ms. Samuel must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) her engagement in the protected activity caused the adverse employment action. *Achagzai*, 170 F. Supp. 3d at 185. The phrase "adverse employment action" has a broader meaning in retaliation cases than it does in discrimination cases. *Id.* Under the *McDonnell Douglas* formulation, once the employee establishes a prima facie case, the burden shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the adverse employee action." *Id.* at 181 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). If the employer succeeds in doing so, the burden shifts back to the employee to

show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *George*, 407 F.3d at 411 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)).

However, in disparate-treatment discrimination and retaliation cases where there is no dispute that the plaintiff experienced an adverse employment action and the employer proffers a valid, nondiscriminatory (or nonretaliatory) basis for that action, courts shortcut the *McDonnell Douglas* framework. In such as case, the court asks only whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee on the basis of race, color, religion, sex, or national origin," or the employee's engagement in protected activity. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012) (adopting *Brady*'s formulation in a retaliation case).

## IV. ANALYSIS

In support of its motion for summary judgment, MPD argues that Ms. Samuel has not established a prima facie case of either discrimination or retaliation, and that MPD had a legitimate, nondiscriminatory basis for firing Ms. Samuel. Def.'s Mot. Summ. J. at 13, ECF No. 27. In support of its argument that Ms. Samuel has not established claims of discrimination or retaliation, MPD states that Ms. Samuel did not suffer adverse employment actions with respect to her career progression or visa applications, that she is not in a protected class because "national origin" is not the same as alienage, and that there is no evidence that her termination was pretextual. Def.'s Mot. Summ. J. at 7–11. As for Ms. Samuel's retaliation claim, MPD similarly argues that she was not constructively discharged. Def.'s Mot. Summ. J. at 10–11.

MPD notes that it would have been illegal to continue employing her—and that there is no evidence that this basis was mere pretext.  Def.'s Mot. Summ. J. at 11–12.

Ms. Samuel responds to each of MPD's arguments.  She argues that she has established a case of discrimination because she suffered adverse employment actions when Ms. Haines-Walton attempted to interfere with her career progression, when Ms. Haines-Walton "sabotaged" her visa application by withholding the extension of her H-1B visa, and when she was forced to resign at the expense of her career.  Pl.'s Opp'n at 12–14.  Moreover, Ms. Samuel argues, MPD's legitimate basis for termination was precipitated by Ms. Haines-Walton's pretextual, discriminatory, and retaliatory failure to ensure that her visa application proceeded.  Pl.'s Opp'n at 18–19.

The Court first addresses whether Ms. Samuel is a member of a protected class.  Although it is true that Title VII does not protect persons based on their citizenship status, a reasonable jury could find that Ms. Samuel's claim is based on her Canadian national origin, not her Canadian citizenship status.  The Court next analyzes whether Ms. Samuel experienced adverse employment actions.  Because she received the promotions that she applied for and her visa would have expired before her termination regardless of whether Ms. Haines-Walton withheld information, she did not suffer adverse employment actions on those bases.  That said, she did suffer such an adverse action when she was constructively terminated.  But because Ms. Samuel did not produce evidence that a reasonable jury could find showed MPD's asserted reason for her termination was pretextual, her claims nonetheless fail.  As a result, the Court grants summary judgment in favor of Defendant on her disparate-treatment claims.

Notwithstanding the Court's ruling, Plaintiff's case survives summary judgment, because Defendant was on notice that Ms. Samuel raised a hostile-work-environment claim, but did not adequately address that claim in its motion for summary judgment.

## A. National Origin vs. Alienage

The Court first addresses MPD's argument that Ms. Samuel's claim is actually that she was discriminated and retaliated against on the basis of alienage rather than national origin. Ms. Samuel's complaint alleges that she was fired because she is from Canada. *See* Compl. ¶ 77–78. MPD argues that the only factual basis for her claim is that she was fired for her visa status as a non-citizen, which it argues is not a protected class under Title VII. *See* Pl.'s Mot. at 8–9. Because it is not clear on what basis Ms. Haines-Walton allegedly had animus for Ms. Samuel, the Court will not enter summary judgment in favor of MPD on this issue.

"The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). This definition does not include citizenship status, *see id.* at 90–91, but employers may not use a citizenship test as a pretext for discriminating on the basis of national origin, *see Anderson v. Zubieta*, 180 F.3d 329, 340 (D.C. Cir. 1999). Thus, Title VII "prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin." *Espinoza*, 414 U.S. at 92. The term "Canadian," like "American," can refer to either national origin or citizenship. *See Shahin v. Delaware*, No. 07-cv-642, 2010 WL 4936455, at *5 (D. Del. Nov. 30, 2010). Unless the record makes clear that the speaker is specifically referring to one or the other, summary judgment against the plaintiff is unwarranted. *See id.*

Although MPD is correct that Title VII does not specifically protect against discrimination based on citizenship or alienage, it has not shown that Ms. Haines-Walton's alleged animus was rooted in Ms. Samuel's status as a non-citizen rather than her Canadian national origin. If Plaintiff were claiming that the Chief of Police's decision to terminate her because of her expired visa status violated Title VII (national origin), MPD's argument might be persuasive. But Ms. Samuel's claim is more nuanced. She argues that her termination by the Chief—whose motivation she does not question and with whom she had a strong relationship, *see* Samuel Dep. at 24, 83—arose from Ms. Haines-Walton's sabotage of her visa application through failing to inform her that she had been approved for an extension. *See* Compl. ¶¶ 66–70; Samuel Decl. ¶¶ 111–17. Ms. Samuel alleges that Ms. Haines-Walton's motivation for that sabotage was animus towards her because of her national origin. In support of this claim, Ms. Samuel alleges that Ms. Haines-Walton prefaced statements with "here in America, we…," Samuel Decl. ¶ 26, and that she intended to hire an "American" instead of supporting her visa application,[4] Samuel Decl. ¶ 38, which led to her firing, Samuel Decl. ¶¶ 108, 114. MPD never disambiguated the word "American." *See* Def.'s Mot. Summ. J. at 8–9. Nor did it explain why the Court should rule out that discrimination based on Ms. Samuel's citizenship was not pretext for discrimination based on her nationality. But even putting pretext aside, although it is possible that Ms. Haines-Walton meant that she intended to hire an American *citizen* over a non-citizen, it is also possible that she meant that she wanted to hire someone who was born in the United States or whose ancestors were born in the United States rather than continue to employ someone from Canada. *See Espinoza*, 414 U.S. at 88; *Shahin*, 2010 WL 4936455, at *5. In the

---

[4] Although the second-hand statements in Ms. Samuel's declaration are insufficient to defeat summary judgment, *see Shuler*, 744 F. Supp. 2d at 327, this statement demonstrates the theoretical basis on which this lawsuit has been brought. *See also* Compl. ¶ 31.

absence of further information to differentiate between these possible meanings, the Court will not grant summary judgment in favor of MPD on this basis.

## B. Adverse Employment Action

The Court next turns to Defendant's argument that Ms. Samuel has not met her burden of showing she suffered adverse employment actions. Def.'s Mot. Summ. J. at 7–11. Ms. Samuel claims that she suffered adverse employment actions in three ways.[5] First, she claims that Ms. Haines-Walton stood in the way of her promotions. Pl.'s Opp'n at 14. Second, she claims that Ms. Haines-Walton "sabotaged" her visa application, which she argues led to her termination. Pl.'s Opp'n at 14–16. Finally, she claims that she was constructively terminated by being forced to resign. Pl.'s Opp'n at 17–18. After outlining the law governing adverse employment actions, the Court addresses each of these purportedly adverse employment actions in order.

The standards for establishing adverse employment actions in discrimination cases and retaliation cases are not identical. *Jones v. Castro*, 168 F. Supp. 3d 169, 178 (D.D.C. 2016). Thus, the Court will analyze Plaintiff's arguments with respect to each standard. *Id.*

In discrimination cases, "[a]n adverse employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

---

[5] Plaintiff also seems to suggest that Ms. Haines-Walton discriminated and retaliated in other, smaller ways. Samuel Decl. ¶¶ 69–73. She provides two examples: (1) Ms. Haines-Walton allegedly attempted to give Ms. Samuel a poor performance evaluation, but apparently did not succeed in doing so because Ms. Samuel refused to sign the draft evaluation; and (2) when Ms. Samuel was promoted and authorized to move her furniture and files, Ms. Haines-Walton temporarily prevented her from moving the furniture (for around an hour), claiming it actually belonged to her. Samuel Decl. ¶¶ 70–72, 89–92. Because Plaintiff does not explain how this "draft" evaluation, which apparently was never finalized, or a one-hour delay in moving furniture would have dissuaded a reasonable worker, these instances are insufficient to constitute a retaliatory adverse action. *Jones v. Castro*, 168 F. Supp. 3d 169, 178 (D.D.C. 2016). Obviously, given that she does not explain any other instances of "miscellaneous" retaliation, let alone how they materially harmed her, her general claim that she was retaliated against is insufficient to show an adverse employment action. *See id.*

different responsibilities, or a decision causing significant change in benefits.'" *Jones*, 168 F. Supp. 3d at 174 (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). In contrast, "[f]or employment actions that do not obviously result in a significant change in employment status[,] such as giving a poor performance evaluation, reassigning office space and equipment . . .[,] an employee must go the further step of demonstrating how the decision nonetheless caused such an objectively tangible harm." *Id.* at 178 (quoting *Douglas*, 559 F.3d at 553). To survive summary judgment, an employee must actually experience adverse consequences "affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas*, 559 F.3d at 552 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).

A retaliatory employment action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted); *see also Segal v. Harris Teeter Supermarkets, Inc.*, No. 15-cv-1496, 2016 WL 7223273, at *7 (D.D.C. Dec. 13, 2016). But "not everything that makes an employee unhappy is an actionable adverse action"—"petty slights" and "minor annoyances" are not actionable under Title VII's retaliation provisions. *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); and then quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

### 1. Ms. Samuel Has Not Shown That She Suffered an Adverse Employment Action with Respect to Her Promotions

MPD argues that Ms. Samuel cannot claim to have suffered adverse employment actions with respect to her career progression because she received every promotion that she sought out.

Def.'s Mot. Summ. J. at 7–8. Ms. Samuel does not dispute that she received the promotions,[6] though she contends that Ms. Haines-Walton made the process more difficult for her than it should have been. Pl.'s Opp'n at 14. MPD has the better argument.

In discrimination cases, non-promotions generally constitute adverse employment actions. *Jones*, 168 F. Supp. 3d at 174 (quoting *Douglas*, 559 F.3d at 552). When an employee ultimately receives the sought-after promotion but claims that her employer discriminatorily interfered with the application process, the employee must show that she was delayed in receiving an increase in income or other employment benefit, and that the gap in income was not remedied after the fact. *See Segal*, No. 15-cv-1496, 2016 WL 7223273, at *7 (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001)) (describing the rule in the context of retaliation, but citing cases relating to discrimination). This is because an employer may "cure" an adverse employment action by "completely undo[ing] the effects of the alleged adverse action." *Id.* (quoting *Andrades v. Holder*, 939 F. Supp. 2d 11, 17 (D.D.C. 2013)).

As noted above, a retaliatory employment action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (internal quotation marks omitted). The standard for ultimately-received promotions articulated in *Segal* also applies to retaliation claims. *See* 2016 WL 7223273, at *7 (describing the rule in the context of retaliation).

Ms. Samuel has not shown that she suffered an adverse employment action with respect to her promotion claim. Although she may factually contend that Ms. Haines-Walton made it

---

[6] Ms. Samuel argues, in conclusory terms and without suggesting how it should affect the Court's analysis, that Ms. Haines-Walton's discriminatory behavior prevented Ms. Samuel from applying for certain positions. Because her argument—to the extent she makes one—is undeveloped, the Court does not address it.

more difficult for her to obtain a promotion, she also concedes that she received all the promotions for which she applied. *See* Samuel Dep. 23–27; Pl.'s Opp'n at 14. And, because it appears she was promoted when she applied for the positions, *see* Pl.'s Opp'n at 14, there is no allegation that there was a delay that deprived her of income or any other employment benefit because of the alleged discrimination or retaliation. *Segal*, 2016 WL 7223273, at *7. Thus, Ms. Samuel has not shown that there is a genuine issue of material fact as to whether she suffered a discriminatory or retaliatory adverse employment action with respect to the promotions she received. *See Segal*, 2016 WL 7223273, at *7.

   2.  Ms. Samuel Has Not Shown That She Suffered an Adverse Employment
       Action With Respect to the Alleged Sabotage of Her Visa Application

Ms. Samuel's opposition brief focuses much more heavily on her claim that she suffered an adverse employment action in the form of Ms. Haines-Walton's alleged "sabotage" of her visa application. *See* Pl.'s Opp'n at 12–18. Even assuming that such a sabotage occurred, the Court finds that no reasonable juror would have a basis to conclude that such a sabotage caused any objectively tangible harm.

Title VII does not impose an affirmative obligation on employers to sponsor their employees' visa applications. *Kanungo v. Univ. of Kentucky*, 1 F. Supp. 3d 674, 683 (E.D. Ky. 2014); *see also Collins-Pearcy v. Mediterranean Shipping Co. (USA) Inc.*, 698 F. Supp. 2d 730, 760 (S.D. Tex. 2010). Thus, the mere failure to sponsor or continue sponsoring a visa application generally cannot be considered an adverse employment action. *Kanungo*, 1 F. Supp. 3d at 683. Similarly, the mere withholding of information from an employee does not constitute either discriminatory or retaliatory adverse employment action. *Fletcher v. Philip Morris USA Inc.*, 2009 WL 2067807, at *9 (E.D. Va. July 14, 2009) (categorizing the withholding of information as outside the protection of Title VII).

In cases where a plaintiff alleges discriminatory or retaliatory actions that do not obviously result in a significant change in employment status, she must demonstrate that the actions caused objectively tangible harm. *Jones*, 168 F. Supp. 3d at 174 (describing adverse employment actions in discrimination cases); *Achagzai*, 170 F. Supp. 3d at 185 (noting that causation is an element in retaliation cases); *Ramos v. Lynch*, No. 13-cv-0328 (ABJ), 2017 WL 421907, at *4 (D.D.C. Jan. 31, 2017) (noting that "in the retaliation context . . . the plaintiff . . . must suffer some objectively tangible harm"). This causation requirement means that the connection between the allegedly discriminatory or retaliatory action and the objectively tangible harm cannot be "unduly speculative." *Hornsby v. Watt*, 217 F. Supp. 3d 58, 64 (D.D.C. 2016) (quoting *Bridgeforth*, 721 F.3d at 663). In the context of an employer-sponsored visa application, the plaintiff must produce evidence showing that she would otherwise have been successful in her application and that the employer prevented that success. *Collins-Pearcy*, 698 F. Supp. 2d at 760.

Importantly, Ms. Samuel does not allege that Ms. Haines-Walton actually interfered with Duane Morris's pursuit of either her H-1B extension or the appeal of her application for permanent residency. Nor does she contend that she could have further appealed her permanent residency application, which had already failed on original and appellate administrative review. *See* Samuel Dep. Ex. C Attach. 4 at 3. Instead, she merely asserts that Ms. Samuel withheld DHS's written decision from her. *See generally* Pl.'s Opp'n. Thus, although Ms. Samuel complains broadly about Ms. Haines-Walton "sabotaging" her efforts to obtain a visa that would allow her to remain employed at MPD, the only act to which she points to support her claim is the alleged withholding of DHS's approval of an extension to April 2012 (a copy of which was also sent to Duane Morris). *See* Samuel Decl. ¶¶ 112–13.

Even if Ms. Haines-Walton did intentionally withhold information relating to DHS's decision on Ms. Samuel's visa extension, that withholding—or "sabotage," as Plaintiff labels it—in and of itself would not constitute an adverse employment action. Stated differently, if one removes the potential consequences that Plaintiff alleges—her termination—the mere withholding of information, in a vacuum, does not constitute a discriminatory or retaliatory adverse employment action. It does not "obviously" represent a significant change in employment status, *see Jones*, 168 F. Supp. 3d at 174, and, under *Fletcher v. Philip Morris USA Inc.*, amounts to a "petty slight" that would not dissuade a reasonable employee from making or supporting a charge of unlawful discrimination, 2009 WL 2067807, at *9.

Given that the mere withholding of information related to Ms. Samuel's visa application does not itself constitute an adverse employment action, the Court proceeds to analyze whether the withholding of information nonetheless caused objectively tangible harm. Ms. Samuel resigned, allegedly under duress, on October 4, 2013. Samuel Dep. at 43–45. Neither side disputes that her coerced resignation was an adverse employment action that caused her objectively tangible harm. Nor does either side suggest that any other objectively tangible harm arose as a result of the withholding of information prior to Ms. Samuel's resignation.[7] Thus, to determine whether the withholding of information concerning the visa extension is an actionable adverse action, the Court must analyze whether Ms. Haines-Walton's withholding of information caused Ms. Samuel's forced resignation.

---

[7] Although it is of no importance to the Court's analysis because it occurred well after Ms. Samuel's H-1B application could have been extended, the Court notes that Ms. Samuel does not allege that her placement on administrative leave in August 2013 in itself constitutes an adverse employment action. *Hornsby*, 217 F. Supp. 3d at 65–66 (concluding that "that placing an employee on paid administrative leave does not, in and of itself, constitute a materially adverse action for purposes of a retaliation claim" or a discrimination claim).

Despite her affirmative obligation to do so, *see Jones*, 168 F. Supp. 3d at 174, Ms. Samuel has produced no evidence suggesting that she would have been able to secure an immigration status that would have allowed her to continue working at MPD but for Ms. Samuel's alleged withholding of information. Nor has she stated, with any level of specificity, how Ms. Haines-Walton's alleged withholding of information in any way affected her immigration status. And although Ms. Samuel may have been able to apply for another extension of her H-1B application when it expired on April 30, 2012, the longest it could have been extended would have been through September 2012—a year before she was allegedly forced to resign. Samuel Dep. Ex. C. at 3; Samuel Decl. at 107–08; 8 C.F.R. § 214.2(h)(2)(i)(D), (h)(13)(iii)(A), (h)(13)(iii)(C)(1).

Other than by asserting, in conclusory terms, that she "would have made other arrangements to apply for another type of work permit," Samuel Decl. ¶ 68, Ms. Samuel does not identify any other potential immigration avenues that would have allowed her to continue working at MPD beyond September 2012. To the contrary, it appears that the attorneys hired by MPD pursued all available avenues. Ms. Samuel's conclusory, speculative assertion that she, in essence, would have figured something out, is not enough to survive summary judgment. *See Mokhtar v. Kerry*, 83 F. Supp. 3d at 61. And even if the Court were to speculate that some form of immigration status exists that Ms. Samuel could have applied for absent Ms. Haines-Walton's withholding of information, the Court would have to speculate even further to assume that the application would have been successful. *See Collins-Pearcy*, 698 F. Supp. 2d at 760. Such harm is too speculative to constitute objectively tangible harm.

As shown above, Ms. Samuel's H-1B visa necessarily would have expired in September 2012 regardless of any further extensions. Moreover, Ms. Samuel has failed to demonstrate that,

if informed of the extension approval, she would have been able to pursue any other means of achieving legal status that would have allowed her to continue working at MPD.  Consequently, she cannot claim that the only objectively tangible harm she suffered—her termination—arose from Ms. Haines-Walton's withholding of information.  Accordingly, the Court finds that there is no genuine issue of material fact with respect to Ms. Samuel's claim that Ms. Haines-Walton's "sabotage" of her visa application constituted a retaliatory or discriminatory adverse employment action.

### 3.  Ms. Samuel Has Shown That She Suffered an Adverse Employment Action With Respect to Her Threatened Termination

The Court turns to the final basis for Ms. Samuel's claim with respect to adverse employment actions—that she was constructively discharged.  Pl.'s Opp'n at 17–18.  Constructive discharge constitutes an adverse employment action.  *See Joyce v. Office of Architect of Capitol*, 966 F. Supp. 2d 15, 26–27 (D.D.C. 2013); *see also Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 64 (D.D.C. 2006).  "The test for constructive discharge is an objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances."  *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) (citing *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 194 (5th Cir. 1988)) (applying the standard in a retaliation case); *Shelton v. Babbitt*, 921 F. Supp. 787, 792 (D.D.C. 1994) (applying the standard in a discrimination case); *see also Boone v. MountainMade Found.*, 64 F. Supp. 3d 216, 239 (D.D.C. 2014).

Just as neither party disputes that Ms. Samuel could not have continued working at MPD without a lawful immigration status, neither party disputes that Ms. Samuel suffered the adverse-employment-action component of her claim that she was constructively discharged—MPD's argument pertains only to whether the resignation was the result of discrimination.  *See* Def.'s

Mot. Summ. J. at 10–11. The Court agrees that a reasonable person in Ms. Samuel's situation could have felt compelled to resign under the circumstances. *See Aliotta*, 614 F.3d at 566. According to Ms. Samuel, her supervisor called her at the behest of the Chief of Police and said MPD was in the process of removing her from their personnel system. Samuel Dep. at 43–44. Then, when she said she perceived the inevitable termination as unlawful, her supervisor told her he needed her to "do [him] a favor and resign," and that if she did not resign it would not "look good . . . on [her] record" and would mean she would never work in law enforcement again. Samuel Dep. at 44.

A jury could certainly find that a reasonable person in Ms. Samuel's situation would have felt compelled to resign. According to Ms. Samuel, she was directly threatened with termination if she did not resign, a situation of "six of one, a half-dozen of the other." But to pressure her into electing termination, her supervisor informed her that a termination would mean that she could never work in law enforcement again. Given that Ms. Samuel's career centered on the criminal justice system, Samuel Decl. ¶ 122, a jury could easily find that she had no meaningful choice in the situation: she could either continue working for a short period of time, and then never work in her field again, or resign. Thus, Ms. Samuel's claim that she suffered an adverse action through her constructive discharge remains.

### C. Pretext

Now that the Court has narrowed the issues—and given that both parties agree that (1) Ms. Samuel experienced an adverse employment action when she was constructively terminated and (2) MPD has stated a legitimate, non-discriminatory basis for the termination—the Court moves to the *Brady* inquiry of whether Plaintiff has produced sufficient evidence showing that her termination was the result of discrimination or retaliation. MPD argues that there is no

evidence that Ms. Haines-Walton—or anyone at MPD, for that matter—forced her to resign because of her national origin or in retaliation for her protected activity, and that MPD had no choice but to terminate her because it would have been illegal to continue employing someone without lawful immigration status.

Under *Brady*, the plaintiff must produce sufficient evidence for a reasonable jury to find that the employer intentionally discriminated against the plaintiff based on her protected category. To do so, she must establish that a jury could find that a discriminatory or retaliatory motive was "more likely than not" the cause of the adverse employment action. *Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994); *accord Omwenga v. United Nations Found.*, No. 15-cv-0786, 2017 WL 1154954, at *4 (D.D.C. Mar. 27, 2017) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (noting that a termination generally gives rise to an inference of discrimination only when a plaintiff shows that "if otherwise unexplained, [the termination was] more likely than not based on the consideration of impermissible factors"). Plaintiffs generally show pretext by demonstrating bias or disparate treatment on the part of the employer. *See Coats v. DeVos*, 13-cv-2001 (RDM), 2017 WL 521500, at *8 (D.D.C. Feb. 8, 2017). Title VII does not protect employees from bad managers or workplace conflicts unconnected to discrimination; sometimes people just do not get along. *See Light v. Mills*, 895 F. Supp. 2d 191, 194 (D.D.C. 2012), *aff'd*, 582 F. App'x 5 (D.C. Cir. 2014) (noting that inability to get along with colleagues is a valid justification for termination); *Grasse v. Delaney*, 76 F. App'x 832, 832–33 (9th Cir. 2003) (noting that the fact a supervisor did not get along with an employee did not establish discriminatory animus).

"When determining whether summary judgment or judgment as a matter of law is warranted for the employer, the court considers all relevant evidence presented by the plaintiff

and defendant." *Brady*, 520 F.3d at 495. To show that proffered reasons for termination are pretextual, plaintiffs may rely on "evidence of discriminatory statements or attitudes." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006). However, "[s]tray comments lacking 'any temporal or substantive relationship' to the adverse employment action are not evidence of discriminatory intent." *Wang v. WMATA*, 206 F. Supp. 3d 46, 74 (D.D.C. 2016) (emphasis omitted) (quoting *Francis v. Perez*, 970 F. Supp. 2d 48, 65 (D.D.C. 2013)); *see also Hampton v. Vilsack*, 760 F. Supp. 2d 38, 51 (D.D.C. 2011) ("Stray remarks, even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff." (quoting *Simms v. U.S. Gov't Printing Office*, 87 F. Supp. 2d 7, 9 (D.D.C. 2000) (alterations omitted)), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012)).

In cases where the person who allegedly has bias against the plaintiff is different from the person or persons who ultimately create the adverse employment action, the employee must show that the "formal decision maker [was] an unwitting conduit of another actor's illicit motives," or, in other words, her "cat's paw." *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011). To do so, the plaintiff must show that (1) the person with bias performed an act motivated by discriminatory or retaliatory animus; (2) the person with bias intended to cause an adverse employment action; and (3) the discriminatory or retaliatory act is the proximate cause of the ultimate employment action. *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (citing *Staub*, 562 U.S. at 422).

Ms. Samuel has not created a genuine dispute of material fact with respect to pretext. As Ms. Samuel concedes, she had a strong working relationship with her colleagues including the supervisors that made the decision to terminate her. *See* Samuel Dep. at 24, 30. She said that

she "had a really good working relationship" with her immediate supervisor.  Samuel Dep. at

24–25.  Ms. Samuel also testified that she was "friendly" with the supervisor that called her and

urged her to resign.  Samuel Dep. at 44.  That supervisor called at the behest of the Chief of

Police, who wanted to see Ms. Samuel's career grow at MPD.  Samuel Dep. at 23.  Indeed, Ms.

Samuel was close friends with the Chief.  Samuel Dep. at 22.  She frequently socialized with her

outside of work, including at close-knit family gatherings over Thanksgiving and Christmas.

Samuel Dep. at 22.

In short, Ms. Samuel claims only that Ms. Haines-Walton discriminated and retaliated

against her.  Samuel Dep. at 30.  She does not, however, allege that Ms. Haines-Walton made the

decision to terminate her.  Ms. Haines-Walton had no control over Ms. Samuel's employment

status, let alone firing power over her, after 2012.  Samuel Decl. ¶ 88; Samuel Dep. at 83.  And

Ms. Samuel does not advance a "cat's paw" argument that Ms. Haines-Walton actually decided

to terminate her, and that Ms. Samuel's supervisors simply rubber-stamped her decision.  But

even if she had, such a claim would fail because there is no indication that Ms. Haines-Walton's

"sabotage" was the proximate cause of her termination.  *See Morris*, 825 F.3d at 668.  Ms.

Samuel's only argument concerning Ms. Haines-Walton *vis a vis* her termination is that Ms.

Haines-Walton withheld information relating to her visa extension.  As noted above, *supra* Part

IV.B.2, even if a sabotage occurred, it did not have any effect on the termination.  Thus, even if

Ms. Haines-Walton had a discriminatory or retaliatory bias against Ms. Samuel, there would be

no basis for a jury to believe that her bias somehow showed pretext on the part of Ms. Samuel's

supervisors, who determined to terminate her.

In this stage of the *Brady* framework, Ms. Samuel has the burden of showing that the

reason articulated by MPD for her termination—that it could not continue employing someone

who does not have legal immigration status—was pretextual for discrimination or retaliation. She has not met that burden. The only person that Ms. Samuel alleges had discriminatory or retaliatory animus against her did not have any control over Ms. Samuel's employment status. Ms. Samuel has simply not produced permissible evidence sufficient for a reasonable jury to find that her termination was motivated by discrimination or retaliation. As a result, the Court grants MPD's motion for summary judgment on her disparate-treatment claims.

### D. Hostile Work Environment

The Court concludes by examining Ms. Samuel's complaint in light of this opinion and seeing what, if anything, remains. MPD argues that, to the extent Ms. Samuel attempts to "bootstrap a hostile work environment claim to her disparate treatment claim," the Court should not allow her to do so because the D.C. Circuit does not look favorably upon combining discrete acts of discrimination into a hostile-work-environment claim. Def.'s Reply at 7–8. The Court first considers whether Ms. Samuel raised a hostile-work-environment claim in her complaint, then analyzes MPD's "bootstrapping" claim.

To state a hostile-work-environment claim, a plaintiff need not spell out a separate count entitled "hostile work environment," or anything to that effect. *Steele v. Schafer*, 535 F.3d 689, 694 (D.C. Cir. 2008). In the absence of prejudice to the opposing party, it is usually sufficient for a plaintiff to allege "discrimination"—because the principle of discrimination includes a hostile-work-environment theory—and pleading facts that generally support a claim of hostile work environment. *See id.*; *Reshard v. LaHood*, 443 F. App'x 568, 570 (D.C. Cir. 2011). Prejudice usually occurs when a plaintiff waits a significant amount of time before arguing that she raised a hostile-work-environment claim. *Reshard*, 443 F. App'x at 570; *see also Kelly v. LaHood*, 840 F. Supp. 2d 293, 305 (D.D.C. 2012).

Ms. Samuel enumerated two "counts" in her complaint: "Discrimination" and "Retaliation." As part of her discrimination count, she alleged that MPD, "discriminated against [her] by making offensive remarks about her nationality and making it difficult for her to advance within the police department." Compl. ¶ 79. Elsewhere in her complaint, she recounted several allegedly hostile interactions with Ms. Haines-Walton. Compl. ¶¶ 18–19, 23. In a general sense, she alleged that Ms. Haines-Walton "target[ed] her because of her national origin" and that Ms. Samuel documented each occurrence of that targeting. Compl. ¶ 21. She also said that she requested a transfer from the HR department because she did not want to interact with Ms. Haines-Walton, which caused her to be "subject to a hostile work environment." Compl. ¶ 27. Taken together, Plaintiff alleged enough to put MPD on notice that she sought recovery for a hostile work environment. Indeed, the concept of "discrimination" "includes a hostile work environment theory." *Steele*, 535 F.3d at 694. Moreover, in raising its bootstrapping argument, *see* Def.'s Reply at 7–8, MPD implicitly acknowledged that Ms. Samuel's hostile-work-environment claim existed in the complaint. The Court has no reason to believe that MPD will suffer undue prejudice given that Ms. Samuel argued in favor of her hostile-work-environment claim in her opposition to summary judgment, and any undue prejudice can be addressed with further briefing on Plaintiff's hostile-work-environment claim. *See* Pl.'s Opp'n at 12.

It is true that "[c]ourts in this [c]ircuit 'frown on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation [or discrimination] into a broader hostile work environment claim.'" *Dudley v. WMATA*, 924 F. Supp. 2d 141, 164 (D.D.C. 2013) (*Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007)). Courts do so because they fear that plaintiffs will use hostile-work-environment claims as a conduit to introduce otherwise-time-barred claims into their complaint. *Id.* at 164, 167. With that said, plaintiffs may plead alternative theories of harm that

stem from the same allegedly harmful conduct, and there is "no authority for the idea that particular acts cannot as a matter of law simultaneously support different types of Title VII claims." *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011). "Thus, although a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own." *Id.*

Ms. Samuel has not merely strewn together unrelated acts of alleged discrimination and retaliation to create a hostile-work-environment claim. She alleges that from when she first joined MPD, Ms. Haines-Walton "maintained an ongoing pattern of harassing [her] because of [her] national origin" to the point where "[t]he environment in HR[] became unbearable" due to Ms. Haines-Walton's "creat[ion] [of] such a hostile work environment that [she] was fearful that [her] job and career were in jeopardy." Samuel Decl. ¶¶ 22, 49, 56, 61. Whatever criticisms MPD may have about these allegations, they are not mere cobbled-together discrete acts to which the D.C. Circuit is averse. *See Dudley*, 924 F. Supp. 2d at 164. And, even though Plaintiff alleges disparate treatment based on some discrete acts that she also includes under the hostile-work-environment umbrella, that fact alone is not a legally sufficient reason to reject her claim. *Baird*, 662 F.3d at 1252. It is not as if plaintiffs must choose between asserting a disparate-treatment claim or a hostile-work-environment claim. *See id.* Thus, Ms. Samuel's hostile-work-environment claim survives MPD's motion for summary judgment—at least for now.

Because Ms. Samuel's hostile-work-environment claim is raised so ambiguously in the complaint and pleadings, the Court will allow MPD to file a renewed motion for summary

judgment on Plaintiff's claim that she suffered a hostile work environment. The Court allows such briefing so that Plaintiff can clarify the contours of her claim and MPD can squarely raise its defenses to such a claim.

## V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: June 28, 2017
                                                    RUDOLPH CONTRERAS
                                                    United States District Judge